IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:13-CV-18-D

| | |
|---|---|
| WILLIAM C. STILLWAGON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| INNSBROOK GOLF & MARINA, LLC, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

On May 4, 2012, William C. Stillwagon ("Stillwagon" or "plaintiff") filed a second amended complaint against Innsbrook Golf & Marina, LLC, also known as Innsbrook Golf & Boat, LLC ("Innsbrook"), Rial Corporation ("Rial"), Richard Rieder, and Alois Rieder (collectively "defendants"), alleging breach of a written contract (count one) or, alternatively, breach of an oral contract (count two) [D.E. 47]. On October 4, 2013, defendants moved for partial summary judgment on count one [D.E. 104] and filed a memorandum in support. See [D.E. 105]. On November 22, 2013, Stillwagon responded in opposition [D.E. 113]. On December 6, 2013, defendants replied [D.E. 114]. As explained below, the court grants defendants' motion for partial summary judgment on count one.

I.

Stillwagon, a resident of Pennsylvania and a licensed Pennsylvania attorney, is Richard Rieder's cousin. See Stillwagon Decl. [D.E. 113-1] ¶¶ 2–3. Defendants Richard Rieder and his son, Alois Rieder, are residents of Austria and the principal owners of two foreign companies, Watersprings Development ("Watersprings") of Switzerland and Nufin Anstalt ("Nufin") of

Liechtenstein. See Alois Reider Decl. [D.E. 105-16] ¶ 2; Richard Reider Decl. [D.E. 105-16] ¶ 2; 2d Am. Compl. [D.E. 47] ¶ 9. These companies are shareholder owners of defendant Rial, a North Carolina corporation. See 2d Am. Compl. ¶¶ 3, 10. Rial is the sole shareholder of defendant Innsbrook, a North Carolina limited liability company. See id. ¶¶ 2, 10.

A simple handshake in 1980 marked the beginning of Stillwagon's decades-long business relationship with the Reiders and their companies. See id. ¶ 11; Stillwagon Decl. ¶ 1. The relationship itself was rather complicated—so complicated, in fact, that the parties dispute why it began and what exactly it entailed. Stillwagon claims that Richard Reider retained him "to generally manage and assist him with his business affairs in the United States." Stillwagon Decl. ¶ 1. To that end, Stillwagon served as president of Rial, managed the finances of various Reider enterprises, and managed and supervised the development of multiple North Carolina properties, including a residential community and accompanying golf course in Bertie County, North Carolina ("Innsbrook Project"). See id. ¶¶ 4–12, 16–17. Defendants claim that Richard Reider retained Stillwagon to serve as an attorney, not a businessman, and that although Stillwagon "also served in various positions as an officer and board member for Rial and Innsbrook, as well as other companies used to manage investments in the United States, he . . . served continuously as legal counsel [for the defendants]." Alois Reider Decl. ¶ 6; see id. ¶¶ 4–5; Richard Reider Decl. ¶¶ 4–5, 7–8; Scheffauer Decl. [D.E. 105-16] ¶¶ 4–8; Niederkofler Decl. [D.E. 105-14] ¶¶ 5–9.

On August 27, 2009, Stillwagon sent a letter to Wilfried Niederkofler ("Niederkofler"), the Reiders' representative in the United States concerning all Rial and Innsbrook matters, informing the Reiders that he wished to leave Rial and Innsbrook. Niederkofler Decl. ¶¶ 4, 10; see [D.E. 16-8]. Stillwagon claimed that, under an alleged oral agreement with the defendants, formed upon commencing the Innsbrook Project, he was entitled to receive 2.5% of the project's profits, or

2

$3,250,000. See [D.E. 16-8] 2. Stillwagon indicated, however, that he "would be willing to consider an alternative, compromise amount" of $1.6 million, coupled with "a release and indemnification [from] all claims both foreign and domestic." Id.

To facilitate Stillwagon's departure, the Reiders asked Stillwagon to draft the necessary legal documents, which would settle the issue of remuneration owed to Stillwagon for his work on the Innsbrook Project and end the parties' business relationship. See Stillwagon Decl. ¶ 39; Mem. Supp. Mot. Summ. J. [D.E. 105] 1. Stillwagon drafted and signed a Severance and Release Agreement ("Severance Agreement"), dated November 9, 2009, in his office in Pennsylvania. See Stillwagon Decl. ¶ 39; Mem. Supp. Mot. Summ. J. 7–8; Severance Agreement [D.E. 11-1]. Alois Rieder signed it in Austria as the "authorized representative" of Richard Reider, Rial, Innsbrook, Watersprings, Nufin, and two other Reider companies, Seg Anstalt ("Seg") and All Seasons Development, Inc. ("All Seasons"), that have since been dissolved. See Severance Agreement 1, 4. The Severance Agreement terminated Stillwagon's employment as manager of Innsbrook and president of Rial, Seg, and All Seasons, but Stillwagon continued to serve as vice president of Rial until May or June 2010. See id. 1; 2d Am. Compl. ¶ 37.

The Severance Agreement called for Stillwagon to receive four annual payments of $300,000 each, totaling $1.2 million, beginning on April 1, 2010. See Severance Agreement 1. Defendants paid Stillwagon the first installment as agreed, but refused to pay the remaining three after allegedly uncovering "widespread fraud on the Innsbrook Project." Mem. Supp. Mot. Summ. J. 2.

On September 27, 2011, Stillwagon filed suit in the Court of Common Pleas of Westmoreland County, Pennsylvania, asserting breach of contract under the Severance Agreement. See [D.E. 1-2]. On October 20, 2011, defendants removed the case to the United States District Court for the Western District of Pennsylvania [D.E. 1]. On November 14, 2011, Stillwagon filed

3

an amended complaint [D.E. 11]. After Innsbrook and Rial answered and asserted affirmative defenses seeking to void the Severance Agreement [D.E. 38], Stillwagon filed a second amended complaint on May 4, 2012, adding another cause of action for breach of the oral contract he allegedly entered into with defendants upon commencing the Innsbrook Project. See 2d Am. Compl. ¶¶ 56–61. On June 1, 2012, defendants answered Stillwagon's amended complaint and asserted numerous defenses and counterclaims [D.E. 51].

On June 21, 2012, Stillwagon moved to dismiss defendants' counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7) [D.E. 54]. On July 27, 2012, the Reiders moved to dismiss for lack of jurisdiction or, alternatively, to transfer venue to this district [D.E. 59]. On August 15, 2012, Innsbrook and Rial moved to join the Reiders' motion [D.E. 63]. On March 20, 2013, the Western District of Pennsylvania granted in part and denied in part Stillwagon's motion to dismiss, granted Innsbrook and Rial's motion for joinder, granted the Reiders' motion to transfer venue, and transferred the case to this district [D.E. 70–74]. On June 20, 2013, defendants filed their answer and counterclaims concerning Stillwagon's second amended complaint [D.E. 96].

On October 4, 2013, defendants moved for partial summary judgment on Stillwagon's breach of written contract claim [D.E. 104]. Defendants contend that the Severance Agreement is unenforceable because Stillwagon negotiated and drafted the agreement as defendants' attorney, failed to advise defendants of the material conflict of interest associated with his dual role as defendants' attorney and party to the agreement, as the Pennsylvania Rules of Professional Conduct required him to do, and essentially "bargain[ed] against his own clients" to craft an unconscionable contract. Reply [D.E. 114] 7; see Mem. Supp. Mot. Summ. J. 9–17; Answer [D.E. 96] ¶¶ 90–96. Moreover, defendants contend that Stillwagon failed to advise them to seek independent review of the Severance Agreement, as the Pennsylvania Rules of Professional Conduct also required him to

4

do, and that no other attorney reviewed the Severance Agreement before Alois Reider signed it. See Mem. Supp. Mot. Summ. J. 8; Suppl. Niederkofler Decl. [D.E. 114-1] ¶¶ 2–12. Stillwagon responds that he had no duty to advise defendants of any alleged conflict of interest because he and defendants shared a business relationship, not an attorney–client relationship. See Mem. Opp'n Mot. Summ. J. [D.E. 113] 6–11. Stillwagon also argues that the Pennsylvania Rules of Professional Conduct have no bearing on the Severance Agreement's enforceability. See id. 14–17. Finally, Stillwagon contends that he believed that the Reiders' attorneys and representatives in Europe reviewed the Severance Agreement, and that Alois Reider signed it "over the objection" of independent counsel. Id. 10; see Stillwagon Decl. ¶¶ 39–40.

II.

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). In evaluating a motion for summary judgment, the court views the evidence and the inferences drawn from that evidence in the light most favorable to the nonmoving party. See Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam); Scott v. Harris, 550 U.S. 372, 378 (2007).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). The nonmoving party must do more than present a "scintilla of evidence" in its favor. Anderson, 477 U.S. at 252. Rather, the nonmoving party must present "sufficient evidence" such that reasonable jurors could find for it. Id. at 249. Accordingly,

5

a court may grant summary judgment if the nonmoving party's evidence is "merely colorable" or "not significantly probative." Id. at 249–50; see Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

A.

In diversity cases, the court ordinarily applies the substantive law and choice-of-law rules of the state in which it sits. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496–97 (1941); Kenney v. Indep. Order of Foresters, 744 F.3d 901, 905 (4th Cir. 2014); Martinez v. Nat'l Union Fire Ins. Co., 911 F. Supp. 2d 331, 335 (E.D.N.C. 2012). When a diversity action is transferred pursuant to 28 U.S.C. § 1404(a), however, the transferee court must apply the substantive law and choice-of-law rules of the state in which the action was filed (here, Pennsylvania). See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 559–600 (4th Cir. 2004); Myelle v. Am. Cyanamid Co., 57 F.3d 411, 413–14 (4th Cir. 1995).

The parties dispute whether Pennsylvania's choice-of-law rules call for the application of North Carolina law or Pennsylvania law. Stillwagon favors North Carolina law, and argues that under the Severance Agreement's choice-of-law provision, North Carolina law governs disputes regarding the Severance Agreement's enforceability. Severance Agreement 3; see Stillwagon v. Innsbrook Golf & Marina, LLC, Civil Action No. 2:11-cv-1338, 2013 WL 1180312, at *6 (W.D. Pa. Mar. 20, 2013) (unpublished); Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999) (noting that Pennsylvania courts "generally honor[] the intent of the contracting parties and enforce[] the choice of law provisions in contracts executed by them" (quotation omitted)). Notwithstanding the Severance Agreement's choice-of-law provision, defendants argue that Pennsylvania law governs this particular dispute regarding the Severance Agreement's enforceability, which touches on whether a licensed Pennsylvania attorney complied

6

with his obligations of professional responsibility. See Stillwagon, 2013 WL 1180312, at *8 (concluding that Pennsylvania law governed defendants' breach of fiduciary duty counterclaim because "Pennsylvania has a strong interest in regulating the conduct of its attorneys and would subject [Stillwagon] to disciplinary action in [Pennsylvania]"); see also CenTra, Inc. v. Estrin, 538 F.3d 402, 409 (6th Cir. 2008) (noting as relevant to the choice-of-law analysis the fact that the case concerns matters of professional responsibility).

The court need not decide whether North Carolina law or Pennsylvania law governs the Severance Agreement's enforceability because the choice of law will not affect the outcome of the parties' dispute. See, e.g., Caper Corp. v. Wells Fargo Bank, N.A., No. 13-2152, 2014 WL 3511928, at *5 (4th Cir. July 17, 2014) (per curiam) (unpublished); CenTra, Inc., 538 F.3d at 409; Volvo Constr. Equip. N. Am., Inc., 386 F.3d at 600–01. North Carolina and Pennsylvania's Rules of Professional Conduct are identical concerning conflict-of-interest issues. Compare N.C. Rules of Prof'l Conduct R. 1.7, 1.8, with Pa. Rules of Prof'l Conduct R. 1.7, 1.8. Moreover, both North Carolina and Pennsylvania courts closely scrutinize transactions between attorneys and their clients, and require the attorney to show that the transaction was fair. Compare, e.g., Mebane v. Broadnax, 183 N.C. 333, 335, 111 S.E. 627, 629 (1922), with, e.g., Meara v. Hewitt, 455 Pa. 132, 135, 314 A.2d 263, 265 (1974). Thus, in resolving defendants' motion for partial summary judgment, the court cites the Pennsylvania Rules of Professional Conduct, which govern Stillwagon's conduct as a licensed Pennsylvania attorney, but looks to relevant North Carolina and Pennsylvania decisions.

B.

Initially, the court first addresses whether an attorney–client relationship existed between Stillwagon and defendants. In North Carolina, "the relation of attorney and client may be implied from the conduct of the parties, and is not dependent on the payment of a fee, nor upon the execution

7

of a formal contract." N.C. State Bar v. Sheffield, 73 N.C. App. 349, 358, 326 S.E.2d 320, 325 (1985). "The dispositive question . . . is . . . whether [the attorney's] conduct was such that an attorney–client relationship could reasonably be inferred." Id., 326 S.E.2d at 325. Pennsylvania law is materially indistinguishable. See, e.g., Atkinson v. Haug, 424 Pa. Super. 406, 411–412, 622 A.2d 983, 986 (1993) ("Absent an express contract, an implied attorney/client relationship will be found if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him.").

Defendants have marshaled overwhelming evidence of an attorney–client relationship. See Tummerello Decl. & Exs. 1–125 [D.E. 105-3 to D.E. 105-12]. Stillwagon provided legal advice to defendants, executed real estate deals as counsel for defendants, billed defendants for legal services, corresponded with defendants on his law firm's letterhead, and represented himself to others, including the federal government, as defendants' attorney. See, e.g., Tummerello Decl. Ex. 1 (letter from "William C. Stillwagon, Attorney at Law" to Richard Reider, dated February 22, 1980); id. Ex. 25 (invoice for legal services from Stillwagon to Rial, dated January 11, 2001); id. Ex. 32 (letter from another attorney to "William C. Stillwagon, Esquire, William C. Stillwagon, P/C," dated June 11, 2001, stating, "I understand that you are a principal [of Rial] and [Rial's] legal counsel"); id. Ex. 55 (letter from "William C. Stillwagon P/C, Attorneys at Law" to Swissreal Investments Ltd., dated May 1, 2002, stating, "I represent Richard Rieder on his United States investments"); id. Ex. 96 (Agricultural Foreign Investment Disclosure Act Report for Seg, dated July 13, 2005, in which Stillwagon identifies himself as the "Attorney" for Seg); id. Ex. 112 (United States income tax return of a foreign corporation, dated November 14, 2006, in which Stillwagon identifies himself as

8

"Attorney at Law" for Seg); id. Ex. 120 (North Carolina general warranty deed, dated August 12, 2009, prepared by "William C. Stillwagon, Attorney" for Rial). Given Stillwagon's conduct, the Reiders reasonably believed that Stillwagon served as legal counsel to them and their companies.

Swimming against this evidentiary tsunami, Stillwagon seeks a lifeline in State v. Pledger, 257 N.C. 634, 127 S.E.2d 337 (1962). In Pledger, the North Carolina Supreme Court held that a non-lawyer who prepares legal documents for his corporate employer does not engage in the unauthorized practice of law where the documents further a business transaction in which the corporation has a "primary interest." Id. at 637–38, 127 S.E.2d at 339–40. Citing Pledger, Stillwagon claims that he "relied on his legal background and expertise to perform his duties" at Rial, Innsbrook, and other Reider companies, but never served as defendants' attorney. Mem. Opp'n Mot. Summ. J. 9.

Pledger does not rescue Stillwagon. The issue is not whether Stillwagon engaged in the unauthorized practice of law. Rather, the issue is whether Stillwagon and defendants shared an attorney–client relationship. The existence of an attorney–client relationship turns on what the client reasonably believed based on the attorney's conduct, not on how the attorney characterizes his conduct. Moreover, and in any event, the record belies Stillwagon's claim that he used his legal training only to perform his duties as an officer of various Reider companies. Indeed, after executing the Severance Agreement, Stillwagon continued to bill for legal services. See Tummerello Decl. Exs. 122–23 (invoices for legal services from "William C. Stillwagon, P/C, Attorneys at Law" to Rial, dated July 19 and August 12, 2010). Thus, no genuine issue of material fact exists concerning whether Stillwagon and defendants shared an attorney–client relationship. They did.

C.

Next, the court must determine whether the Severance Agreement requiring Stillwagon's

9

clients to pay him $1.2 million and release him from almost all liability is enforceable, even though Stillwagon drafted the Severance Agreement on his clients' behalf. Cf. [D.E. 96] ¶¶ 90–96. North Carolina courts "look[] on transactions . . . between an attorney and his client with suspicion, and will not permit [such a transaction] to stand unless the attorney demonstrates the entire good faith of the transaction." Mebane, 183 N.C. at 335, 111 S.E. at 629 (quotation omitted); see Tatom v. White, 95 N.C. 453, 461 (1886); cf. Randolph v. Schuyler, 284 N.C. 496, 501, 201 S.E.2d 833, 836 (1974). The attorney must prove that he was "absolutely frank and open with his client, disclose[d] every fact of which he ha[d] knowledge, and as well any professional opinion he may have formed, which could in any way affect the client in determining whether or not to [enter into the transaction]." Mebane, 183 N.C. at 335, 111 S.E. at 629. Pennsylvania courts view transactions between attorneys and their clients with the same suspicion, and will not enforce such a transaction unless the attorney proves that "he fully disclosed the facts of the transaction to his client, and that the transaction was fair and cons[c]ionable." Meara, 455 Pa. at 135–36, 314 A.2d at 265; see Kribbs v. Jackson, 387 Pa. 611, 621–22, 129 A.2d 490, 495–96 (1957); Lynch v. Hook, 298 Pa. Super. 27, 29–32, 444 A.2d 157, 159–60 (1982). In short, whether it be "the most absolute good faith" in North Carolina, Mebane, 183 N.C. at 335, 111 S.E. at 629, or "the most perfect good faith" in Pennsylvania, Kribbs, 387 Pa. at 621, 129 A.2d at 495, a high standard of care applies to an attorney's conduct when transacting with clients. Unless the attorney proves that his conduct conformed to that high standard, the transaction is unenforceable. See, e.g., Mebane, 183 N.C. at 335, 111 S.E. at 629; Kribbs, 387 Pa. at 621–22, 129 A.2d at 495–96.

In determining whether Stillwagon acted with "the most absolute good faith" or "the most perfect good faith" in negotiating, drafting, and entering the Severance Agreement, the court begins with the relevant Pennsylvania Rules of Professional Conduct. Rule 1.8(a) states:

10

> A lawyer shall not enter into a business transaction with a client . . . unless:
>
> > (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
> >
> > (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
> >
> > (3) the client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Pa. Rules of Prof'l Conduct R. 1.8(a). Additionally, the commentary to Rule 1.8 provides:

> The risk to a client is greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's financial interest in the transaction. Here the lawyer's role requires that the lawyer must comply, not only with the requirements of [Rule 1.8(a)], but also with the requirements of Rule 1.7. Under [Rule 1.7], the lawyer must disclose the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the expense of the client. Moreover, the lawyer must obtain the client's informed consent. In some cases, the lawyer's interest may be such that Rule 1.7 will preclude the lawyer from seeking the client's consent to the transaction.

Id. cmt. n.3; see id. R. 1.7 & cmt. n.10.

Stillwagon did not comply with Rules 1.7 and 1.8. Defendants asked Stillwagon to draft the Severance Agreement as their attorney, and Stillwagon was a party to the agreement. See Alois Reider Decl. ¶¶ 8–9; Richard Reider Decl. ¶¶ 10–11; Niederkofler Decl. ¶ 11. As such, there was a significant risk that Stillwagon's financial interest could hinder his ability to put his clients first. Stillwagon did not disclose this risk, did not obtain defendants' informed consent, and did not advise defendants to seek independent representation. See Alois Reider Decl. ¶¶ 10–13; Richard Reider Decl. ¶¶ 12–15; Niederkofler Decl. ¶¶ 12–15; Scheffauer Decl. ¶ 9.

Moreover, Stillwagon drafted a Severance Agreement that favored his interests at the

11

expense of his clients. According to Stillwagon, the Severance Agreement replaced the oral contract that he allegedly entered into with defendants upon commencing the Innsbrook Project. See [D.E. 16-8] 2; 2d Am. Compl. ¶ 32. Stillwagon alleges that, under the terms of that oral agreement, he was to receive 2.5% of the Innsbrook Project's revenues. See [D.E. 16-8] 2; Severance Agreement 1. When Stillwagon pitched the Innsbrook Project to the Rial board, he estimated net income at $25,364,301.00 to $27,831,099.35. See Tummerello Decl. Ex. 76 (cost proposal). Thus, by Stillwagon's own estimate, he would have made (at most) $695,777.48. Yet, in the letter Stillwagon wrote to Niederkofler informing defendants that he wished to leave Rial and Innsbrook, Stillwagon advised defendants that he was entitled to receive over $2.5 million more ($3,250,000, to be exact), because the Innsbrook Project, "as represented to [him]," was worth $135 million. [D.E. 16-8] 2. Stillwagon then indicated that he would be willing to "compromise" and accept $1.6 million instead, and the Severance Agreement he ultimately drafted called for payment of $1.2 million. Id.; see Severance Agreement 1.

No genuine issue of material fact exists concerning whether Stillwagon acted with "the most absolute good faith" or "the most perfect good faith" in negotiating and drafting the Severance Agreement. He did not. Stillwagon's financial interest and his clients' best interests conflicted. Instead of disclosing in writing this material conflict of interest to his clients, allowing them to decide whether Stillwagon should represent them, advising them in writing to seek independent legal counsel, and obtaining informed consent in writing from the clients, Stillwagon chose to draft and enter the Severance Agreement at his clients' expense. The Severance Agreement is unenforceable under both North Carolina and Pennsylvania law. See, e.g., Mebane, 183 N.C. at 335, 111 S.E. at 629; Meara, 455 Pa. at 135–36, 314 A.2d at 265; Kribbs, 387 Pa. at 621–22, 129 A.2d at 495–96; Lynch, 298 Pa. Super. at 29–32, 444 A.2d at 159–60.

12

In opposition to this conclusion, Stillwagon makes three main arguments. See [D.E. 113].[1] First, Stillwagon contends that he and defendants did not share an attorney–client relationship. The court already has addressed and rejected this argument.

Second, Stillwagon contends that the Pennsylvania Rules of Professional Conduct have no bearing on the Severance Agreement's enforceability. Stillwagon correctly asserts that, in both North Carolina and Pennsylvania, a violation of the Rules of Professional Conduct cannot alone serve as a basis for civil liability. See, e.g., Laws v. Priority Tr. Servs. of N.C., LLC, 375 F. App'x 345, 348 (4th Cir. 2010) (per curiam) (unpublished); McGee v. Eubanks, 77 N.C. App. 369, 374, 335 S.E.2d 178, 181–82 (1985); In re Estate of Pedrick, 505 Pa. 530, 535, 482 A.2d 215, 217 (1984). However, this principle "does not mean that the Rules of Professional Conduct have utterly no bearing on the proper resolution of civil litigation." Cunningham v. Selman, 201 N.C. App. 270, 287, 689 S.E.2d 517, 529 (2009); see, e.g., CenTra, Inc., 538 F.3d at 410. This conclusion follows where, as here, "the disciplinary rules . . . do nothing but reaffirm pre-existing substantive law." Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 251 & n.2, 252, 261–63, 602 A.2d 1277, 1282 & n.2, 1287–88 (1992). The case law and the disciplinary rules regarding attorney–client transactions speak to the same points: the attorney must disclose certain information in writing to his client before entering a transaction with a client, the lawyer must obtain informed consent in writing from his clients, and the client's interests must come first. Thus, the court appropriately considered the Pennsylvania Rules of Professional Conduct in determining whether to enforce the Severance Agreement.[2]

---

[1] In opposing partial summary judgment, Stillwagon makes other procedural arguments that are baseless and do not warrant a separate discussion.

[2] At least one state has held that although an attorney's failure to comply with a disciplinary rule does not create a cause of action, it may provide an appropriate defense in certain cases,

13

Third, Stillwagon contends that even if he and defendants shared an attorney–client relationship, and even if the Pennsylvania Rules of Professional Conduct properly inform the court's analysis, he "complied with the [l]etter and [s]pirit of Rules 1.7 and 1.8." Mem. Opp'n Mot. Summ. J. 17. In support, Stillwagon claims that after he drafted the Severance Agreement, the Rieders' agent, Niederkofler, "told [him] that he would send it to the Rieders in Austria for review by their lawyers and representatives." Stillwagon Decl. ¶ 39. Stillwagon also claims that Niederkofler told him that the Rieders' independent counsel reviewed the Severance Agreement, and that Alois Reider signed it "over the objection" of independent counsel. See id. ¶ 40.

The commentary to Rule 1.8 states that an attorney need not advise his client to seek independent representation if his client already has independent representation. See Pa. Rules of Prof'l Conduct R. 1.8 cmt. n.4. Additionally, the commentary provides that "[t]he fact that the client was independently represented in the transaction is relevant in determining whether the agreement was fair and reasonable to the client." Id.

Stillwagon has failed to create a genuine issue of material fact concerning whether the Severance Agreement was fair and reasonable to defendants. In response to Stillwagon's claim, Niederkofler filed a supplemental declaration stating that no other lawyer besides Stillwagon reviewed the Severance Agreement before the parties signed it. See Suppl. Niederkofler Decl.

---

including where an attorney seeks to enforce an unethical contract. See Evans & Luptak, PLC v. Lizza, 251 Mich. App. 187, 192–97, 650 N.W.2d 364, 368–70 (2002); see also CenTra, Inc., 538 F.3d at 410. After all, "[i]t would be absurd if an attorney were allowed to enforce an unethical . . . agreement through court action, even though the attorney potentially is subject to professional discipline for entering into the agreement." Evans & Luptak, PLC, 251 Mich. App. at 196, 650 N.W.2d at 369 (quotation omitted). At least one North Carolina trial court has reached a similar conclusion. See Dunn v. Dart, No. 09 CVS 02600, 2011 WL 2749569, at *9 (N.C. Super. Ct. July 14, 2011) (unpublished) (holding that a "fee-sharing agreement . . . is not enforceable absent compliance with [N.C. Rules of Prof'l Conduct R. 1.5(e)], and that the failure to comply with that rule can be raised as a defense to an action to enforce fee-sharing pursuant to such an agreement").

14

¶¶ 2–12; see also Alois Reider Decl. ¶¶ 10–11; Richard Reider Decl. ¶¶ 12–13; Niederkofler Decl. ¶¶ 12–13; Scheffauer Decl. ¶ 9. Moreover, Stillwagon has no personal knowledge of any other attorney reviewing the Severance Agreement. See Stillwagon Decl. ¶¶ 39–40; Answer to Interrogatories [D.E. 114-3] 4 ("I understood the [Severance Agreement] would be reviewed by Rico Jenny, a lawyer in Switzerland."). Furthermore, Stillwagon never advised his clients in writing to seek independent legal counsel concerning the Severance Agreement and never received informed consent in writing from his clients. At best, Stillwagon has created a genuine dispute about whether he believed the Reiders had independent representation, not whether the Reiders actually had independent representation. As the commentary to Rule 1.8 provides, it is "[t]he fact that the client was independently represented in the transaction"—not the fact that the attorney believed the client was independently represented in the transaction—that counts. Pa. Rules of Prof'l Conduct R. 1.8 cmt. n.4.

III.

In sum, the court GRANTS defendants' motion for partial summary judgment [D.E. 104] on count one. The Severance Agreement is unenforceable.

SO ORDERED. This 29 day of August 2014.

JAMES C. DEVER III
Chief United States District Judge

15